## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| CHARLES HILL, | ) | CASE NO 8:02CV436 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **MEMORANDUM AND ORDER** |
| KELLOGG USA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| CHARLES HILL, | ) | CASE NO. 8:04CV60 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM AND ORDER** |
| KELLOGG USA, INC. and the | ) | |
| KELLOGG COMPANY-BAKERY, | ) | |
| TOBACCO AND GRAIN MILLERS | ) | |
| PENSION COMMITTEE, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the Court on the Defendants' Motion for Summary Judgment (Filing No. 56 in 8:02cv436, and Filing No. 43 in 8:04cv60).  The Plaintiff Charles Hill is a former employee of Defendant Kellogg USA, Inc.  Hill's Complaint alleges that Defendants Kellogg USA, Inc. ("Kellogg") and Kellogg Company-Bakery, Tobacco and Grain Millers Pension Committee ("Committee") violated his rights under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"), and the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA").  Kellogg and the Committee seek summary judgment on all claims.[1]

---

[1] The Plaintiff's responsive brief contains some facts and citations to the record, but the brief does not comply with NECivR 56.1(b) because it does not address each of the Defendant's numbered, factual allegations and, in the case of disagreement, point the Court to the specific materials on which the Plaintiff relies.  When a responding party fails to comply with NECivR 56.1(b), the movant's allegations of fact are deemed admitted.

## FACTUAL BACKGROUND

Charles Hill began his employment with Kellogg in 1986, and became a permanent full-time employee in 1989. During his full-time employment with Kellogg, he was covered under various Collective Bargaining Agreements ("CBA"s) and contracts that supplemented the CBAs. (Exs. B, C, D and E).[2] From 1994 until at least April 1998, Hill worked on the "third shift" from 11 p.m. to 7 a.m. Kellogg had two other shifts, the "first shift" from 7 a.m. to 3 p.m., and the "second shift" from 3 p.m. to 11 p.m. In April or May 1998, Hill took a leave of absence from Kellogg for health reasons, during which time he was diagnosed with narcolepsy and cataplexy. (Ex. A at 36:6-14, hereafter "Hill Dep."). Narcolepsy is a condition characterized by recurrent episodes of sleep during the day and often disrupted nocturnal sleep. *See* Stedman's Medical Dictionary 1182 (27th ed. 2000). Cataplexy is characterized by transient attacks of extreme generalized weakness. *Id.* at 299.

Kellogg learned of Hill's diagnoses in September 1998. Hill's treating physician, Dr. Harvey Hopkins, released Hill to return to work on September 9, 1998, but stated that Hill "may not work nights." (Hill Dep. at 38:2-39:9; Ex. H). On September 19, 1998, Kellogg physician, Dr. Dean Wampler, issued a "clarification of restrictions" stating that Hill could work either the first shift or second shift, and that Hill was able to work overtime, but only after the first shift or before the second shift. (Ex. I; Hill Dep. 40-41).

On September 14, 1998, within days of receiving a copy of Hill's diagnosis and the recommendation of Hill's physician that Hill be transferred from the night shift, Kellogg transferred Hill from the third shift to the second shift. *Id.* at 43:18-44:17. (Ex. J). In a letter to union representatives, the Omaha plant human resources manager, Tim Silsbee, indicated that Kellogg had been prepared to place Hill on the first shift pursuant to the

---

[2] The Defendants' exhibits are identified throughout this Memorandum and Order by "Ex." and the designated letter only. The exhibits may be located in 8:02cv436, at Amended Index, Filing No. 69; and in 8:04cv60, at Amended Index, Filing No. 62.

supplemental contract to the CBA that was in place at the time, but then decided to place Hill on the second shift because there was an opening on that shift. (Ex. G). Section 807 of the supplemental contract then in effect provided that if employees became unable to perform their assigned duties because of age or physical handicap, they would be considered for a transfer to any job, providing that their plant seniority was sufficient and they were qualified. (Ex. D). Hill testified that, at the time, the second shift responsibility was acceptable to him. *Id.* at 43-44. Dr. Wampler's office clarified Hill's work restrictions as indicated on forms dated November 1, and 24, 1999. (Exs. K, L).

Hill bid for first shift positions throughout 1998 and 1999, but he was not awarded a first shift position due at least in part to the fact that, as Hill acknowledged, he did not have sufficient seniority. (Hill Dep. 48:13-52:10). On several occasions, including in July 1999, September 1999, and January 2000, Hill reported to work after the regular start time for the second shift in violation of Kellogg's call-in policy, and he was informed that these incidents subjected him to the terms of the company's progressive discipline policy. (Hill Dep. at 61:19-62:2; 105:108:2; Exs. Q, R). Kellogg's call-in policy required any employee who was going to be tardy or absent from work to call in at least one hour before start time to inform his supervisor that he would be late. (Plaintiff's Index of Evidence, Filing No. 71, Ex 1-A, hereafter "Mabry Dep." at Ex. 56, Kellogg's Response to EEOC at DEF590-597).[3] On the three occasions noted above, Hill failed to call in one hour before the beginning of his shift, and he received an oral warning, a written warning, and a second written warning. (Exs. Q, R, Mabry Dep. at Ex. 55). Under Kellogg's progressive discipline policy for attendance

---

[3] Plaintiff's evidence will be referred to throughout this Memorandum and Order by "Filing No. 71," unless otherwise stated. Plaintiff's index may be found in Case No. 8:02CV436 at Filing No. 71 and in Case No. 8:04CV436 at Filing No. 64.

issues, an offending employee would be subjected to an oral warning, written warning, final warning, suspension and then termination. (Mabry Dep. at Ex. 56, at DEF592).

As early as March 2000, Kellogg's human resources employees were making efforts to understand whether narcolepsy was covered under the ADA, and whether the ADA required Kellogg to excuse Hill's violation of the call-in policy. At the time, Silsbee, was still the Omaha plant human resources manager, and Betty Mabry was an Omaha plant human resources representative who had been employed by Kellogg for more than 20 years. (Mabry Dep. at 14:7-8; 16:6-11). Mabry made a record of a March 7, 2000, meeting wherein she, Silsbee, and Kellogg's corporate medical doctor discussed Hill's narcolepsy and the ADA. (*Id.* at Ex. 47). Mabry noted that the ADA covers narcolepsy, but that it does not apply to tardiness. (*Id.* at Ex. 47). The note also indicates that the Kellogg managers considered whether to accommodate Hill by transferring him to the first shift, but rejected that accommodation, and decided, instead, to keep him in the second shift because there was a job opening on second shift commensurate with his seniority. (*Id.*)

Hill stopped working in January 2000, and did not return to work until April 2001. Hill took a medical leave of absence during that time because he could not control his "wakefulness" well enough to ensure his timely arrival on the second shift. Hill believed that if he continued to work he would violate Kellogg's call-in policy, which would result in the termination of his employment. (Hill Dep. 204:23-209:1; and 69:14-21, 100:24-103:22, 105:1-108:18). Although Hill concedes that he was not suspended nor docked in pay as a result of the tardies, he argues that he had no choice but to take short-term medical disability or lose his job. He contends that this change in status cost him "a lot of pay." (*Id.* at 208:6-13.)

4

During Hill's leave, Dr. Hopkins provided a letter to Kellogg dated February 11, 2000, regarding Hill's disability. In the letter, Dr. Hopkins stated:

> Continuing his work assignment on the second shift is likely to result in continuing and possibly increased tardiness and continuing and possibly increased absenteeism. **If his employer is willing to accommodate Mr. Hill's disability by accepting this tardiness and absenteeism without jeopardizing his employment status,** then continuing on the second shift may be appropriate although not medically preferred. However, I believe that changing to the day-work schedule is the appropriate accommodation so that his narcolepsy can be successfully treated.. . . The cornerstone to therapy for [narcolepsy] is avoiding shifting in sleep schedule and a regular timing of nocturnal sleep from 10:30 p.m. to 7 a.m. Without this rigid schedule, it is quite difficult to treat narcolepsy. . . .

(Ex. M; Hill Dep. at 55:1-25)(emphasis added).

Hill remained off work from January 2000 through April 2001. On November 28, 2000, noting that Hill's narcolepsy symptoms were then under control, Dr. Hopkins released Hill to return to work on the second shift. (Ex. N). Nevertheless, Hill remained off work. As reported in Dr. Wampler's treatment note dated December 19, 2000, Hill stated that he could go into "stage IV sleep" within 30 seconds and that sleeping through an alarm for him was a "common occurrence." Dr. Wampler stated that "it is medically feasible that [Hill] would, in fact, sleep through alarms and have absence[s] and tard[iness]." (Filing No. 71, DEF0731-32).

In February 2001, Hill bid on a first-shift job, and based on his seniority, he received the job. On February 28, 2001, Dr. Wampler completed a work restriction report which stated that Hill had no physical restrictions but that he was limited to the first shift. (*Id.* at DEF671). That release was later rescinded pending additional evaluation. (*Id.* at DEF810). On March 14, 2001, Dr. Hopkins attempted to clarify his position. In a letter to Hill, Dr. Hopkins stated that Hill could work a daytime shift without difficulties and that he could work an evening shift depending on his symptoms at the time. (Ex. O). Dr. Hopkins referenced

Dr. Wampler's desire for further evaluation, and Dr. Hopkins recommended Hill undergo a "Mean Wakefulness Test."

On April 12, 2001, after Hill was subjected to additional tests, Dr. Hopkins released Hill to return to work either on the first or second shift, but not on the third shift. (Ex. P). Hill returned to work on April 30, 2001, and continued working the first shift until he stopped work in December 2001, due to depression. From April 2001 though December 2001, Hill did not have difficulty performing his job. The only difficulty he experienced was on an occasion when he was directed to work on a Saturday, which he understood was "overtime" and prohibited by his medical restrictions, and so he did not report to work. During the months from April to December 2001, when Hill experienced cataplexy, he was allowed to sit in a chair for a few minutes until the episode passed. (Hill Dep. at 140-146).

Hill filed his Complaint in 8:02CV 436, on September 19, 2002, alleging that Kellogg violated his rights under the ADA and the FMLA. Specifically, Hill alleges that Kellogg failed to reasonably accommodate his disability by refusing to transfer him to the first shift and by refusing to allow him to be tardy on occasion without risking progressive discipline. Hill also alleges that Kellogg violated the FMLA by refusing his request to use FMLA in an intermittent manner to cover his tardiness from work.

In October 2002, Hill submitted an application for disability benefits under Kellogg's Pension Plan. (Ex. T). In support of this application, Hill provided Kellogg and its Pension Committee with physician reports, including the reports of Dr. Hopkins. (Ex. U). On February 13, 2002, the Pension Committee denied Hill's application for disability benefits. The Committee concluded that Hill did not have a disability as defined in the plan. (Ex. V). Hill appealed the decision, but that and a second appeal were denied. (Exs. X and Y, finding no permanent and total disability). In 2004, after being denied disability pension benefits

6

from the company's plan, Hill filed a second action, 8:04CV60, alleging that Kellogg violated ERISA by denying his application for disability benefits.

Kellogg filed a motion for summary judgment in these related cases, seeking judgment on all claims presented by Hill. With respect to Hill's ADA claim, Kellogg contends that Hill cannot show that he is "disabled" as construed under the ADA, because, among other reasons, he cannot show that he is significantly restricted in his ability to perform either a class of jobs or a broad range of jobs in various classes. Kellogg also contends that by transferring Hill from the third shift, Kellogg provided Hill with the only accommodation suggested by his physician.

Kellogg seeks summary judgment on the FMLA claim because it is barred by the applicable statute of limitations and because Hill is unable to demonstrate that he suffered any adverse employment action as a result of taking FMLA leave. Finally, both Kellogg and the Committee seek summary judgment on the ERISA claim because they are not proper defendants under ERISA, and, in the alternative, Hill cannot show that the Committee's decision to deny Hill disability benefits was "arbitrary and capricious."

## STANDARD OF REVIEW

In the context of a summary judgment motion, the Court's function is to consider the evidence and determine whether the moving party is entitled to judgment as a matter of law. The proponent of a motion for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). In response to the proponent's showing, the opponent's burden is to "come forward with

7

'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (quoting Fed. R. Civ. P. 56(e)).  A "genuine" issue of material fact is more than "some metaphysical doubt as to the material facts."  *Id.*

Although summary judgment is to be used sparingly in employment discrimination cases, it is appropriate where one party has failed to present evidence sufficient to create a jury question as to an essential element of its claim*. Whitley v. Peer Review Sys., Inc*., 221 F.3d 1053, 1055 (8th Cir. 2000); *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir. 1994).   A plaintiff must go beyond the prima facie case to support a reasonable inference regarding the allegedly illicit reason for the employer's action.  *Landon v. Northwest Airlines, Inc*., 72 F.3d 620, 624 (8th Cir. 1995).   Summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  *Celotex*,  477 U.S. at 325.

## ANALYSIS

**Americans with Disabilities Act Claim**

The ADA extends its protections to "a qualified individual with a disability."  42 U.S.C. § 12112(a).  To be a "qualified individual" within the meaning of the ADA, an employee must "(1) possess the requisite skill, education, experience, and training for h[is] position, and (2) be able to perform the essential job functions, with or without reasonable accommodation." *Heaser v. Toro Co.*, 247 F.3d 826, 830 (8th Cir. 2001).  There is no genuine dispute that Hill was able to perform the job with or without reasonable accommodation.  However, Kellogg argues that Hill cannot demonstrate that he is disabled under the ADA definition.  The ADA defines disability as "(A) a physical or mental impairment that substantially limits one or

more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(2).

Kellogg argues that Hill is not disabled according to the definition because his narcolepsy and cataplexy do not substantially limit a major life activity.  In *Fjellestad v. Pizza Hut of America, Inc.,*188 F.3d 944 (8th Cir. 1999), the Eighth Circuit Court of Appeals elaborated upon the meaning of subsection (A), above.

> Major life activities include caring for one's self, performing manual tasks, walking, seeing, hearing, breathing, learning and working.  29 C.F.R. § 1630.2(I) (1998).  Sitting, standing, lifting and reaching also are considered major life activities.  *Helfter v. United Parcel Serv., Inc.,* 115 F.3d 613, 616 (8th Cir.1997). An impairment is "substantially limiting" if it renders an individual unable to perform a major life activity that the average person in the general population can perform, or if it significantly restricts the condition, manner, or duration under which an individual can perform a particular major life activity as compared to an average person in the general population. 29 C.F.R. § 1630.2(j)(1)(i)-(ii). The following factors are considered in determining whether a person is substantially limited in a major life activity: (1) the nature and severity of the impairment; (2) its duration or anticipated duration; and (3) its long-term impact. 29 C.F.R. § 1630.2(j)(2)(i)-(iii). Additionally, the determination of whether an individual is substantially limited in a major life activity must be made on a case by case basis.  *Doane v. City of Omaha,* 115 F.3d 624, 627 (8th Cir.1997), cert. denied, 522 U.S. 1048, 118 S.Ct. 693, 139 L.Ed.2d 638 (1998).

*Id.* at 948-949.

Kellogg assumes that Hill will argue that the "the major life activity" that he claims is substantially limited is "working." (8:02cv436, Filing No. 57; 8:04cv60, Filing No. 44,  Kellogg Brief in Support of the Motion for Summary Judgment, p. 12).  Kellogg contends that Hill cannot demonstrate that he was significantly restricted in his ability to perform either a class of jobs or a broad range of jobs in various classes, and therefore, that he is not substantially limited in the major life activity of working.  Thus, Kellogg argues that Hill's inability to work the third shift is not relevant because the Eighth Circuit Court has held that a person's inability to perform *one particular job* is not a substantial limitation on the major life activity

9

of working, and that "working" does not mean working a particular job of the person's choice.    *See Knutson v. Ag Processing, Inc.*, 394 F.3d 1047, 1051 (8th Cir. 2005). Considering the evidence and all reasonable inferences in favor of the nonmoving party – Hill, I conclude that Kellogg's assumption is misdirected.

Hill alleges that his impairment is narcolepsy and cataplexy, and his Complaint can fairly be read to allege that the major life activity affected by Hill's impairment is his ability to regulate or control his wakefulness and sleep.  The EEOC's regulations state that major life activities include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working."  The list is illustrative, not exhaustive.  Hill's brief notes that "sleep" has also been found to be a major life activity by at least one court. *See Pack v. K-Mart Corp.*, 166 F.3d 1300, 1305 (10th Cir. 1999)(holding that "[s]leeping is a basic activity that the average person in the general population can perform with little or no difficulty, similar to the major life activities of walking, seeing, hearing, speaking, breathing, learning, working, sitting, standing, lifting, and reaching); and 8:02cv435, Filing No. 70, at 8.  *See also Colwell v. Suffolk County Police Dept.*, 158 F.3d 635, 643 (2nd Cir. 1998) (stating that sleep is "undoubtedly" a major life activity); *Equal Employment Opportunity Commission v. Sara Lee Corp.*, 237 F.3d 349, 352-3 (4th Cir. 2001) (assuming that sleeping is a major life activity); *Boerst v. General Mills Operations, Inc.*, 25 Fed.Appx. 403, 406 (6th Cir. 2002)(acknowledging that sleeping is a major life activity under the ADA); and *Heisler v. Metropolitan Council*, 339 F.3d 622, 628 (8th Cir. 2003)(assuming that sleeping is a major life activity).  The cases that recognize sleep as a major life activity have not found a disability under the ADA when a plaintiff is unable to distinguish a lack of sufficient sleep from conditions that are shared in the general population.  However, in Hill's case, the major life activity is limited in a different way.

There is evidence that Hill is unable to wake from sleep when he wants to, and he is overcome by fatigue, weakness, and the need to sleep, without notice. There is evidence sufficient to create a genuine issue of whether Hill is unable to control his sleep and wakefulness in a manner different from others in the general population. Moreover, there is no evidence that Hill is currently able to treat his narcolepsy to avoid these substantial limitations, though there is some evidence that medicine may help control the condition. I conclude that there is a genuine issue of whether Hill's narcolepsy and cataplexy substantially limited his major life activity of regulating his wakefulness and sleep. Summary judgment will not be granted to Kellogg on that theory.

Even if there were no evidence to support a finding that Hill was a "qualified individual with a disability" under §12101(2)(A), there is evidence creating a genuine issue of material fact as to whether Kellogg *regarded* Hill as being disabled under the ADA, thereby satisfying the definition of disability pursuant to §12102(2)(C). Within a few days of learning of Hill's diagnosis, Kellogg responded to Dr. Hopkins's request that Kellogg transfer Hill from the third shift to the second shift. The evidence of the communications surrounding that transfer and the fact of the transfer are sufficient to create a genuine issue of material fact as to whether Kellogg regarded Hill as having a disability. (Mabry Dep. at 15:22-17:22 and Ex. 44, 47, and Ex. G). For example, Betty Mabry, who had worked as a human resources representative for Kellogg for 20 years at that time, stated that Dr. Hopkins' request of February 11, 2000, was a request that Hill be moved to "a day shift or day work cycle" which would be from "7 a.m. until 3 p.m." (*Id.* at 13:5-6, 9). In Mabry's record of her meeting with Silsbee and Kellogg's corporate physician dated 3-7-2000, there is an acknowledgment that Kellogg considered Hill to be disabled, and that Kellogg considered and denied the transfer to the first shift in favor of assigning Hill to the second

11

shift. (*Id.* at 17-18; Ex. 47).  There is evidence that Silsbee believed that Section 807 of the supplemental contract to the CBA, which applies to Kellogg employees who become "handicapped,"  would have given him the authority to place Hill on the first shift. (Ex. G)

Kellogg argues that even if the Court determines that Hill is a "qualified person with a disability" under the ADA, it is entitled to summary judgment because there is no evidence that Kellogg failed to reasonably accommodate Hill's disability as required by federal law. Hill asked Kellogg to accommodate him either by transferring him to the first shift, or by waiving the disciplinary penalty for tardiness when he worked the second shift.  Kellogg maintains that the only clear request that Hill made was granted in 1998, when he was transferred from the third shift.

With regard to a failure-to-accommodate claim, the Eighth Circuit Court of Appeals has stated:

> The failure to make reasonable accommodations in the employment of a disabled employee is a separate form of prohibited discrimination.  Under the Act and its regulations, such discrimination occurs if "a covered entity [does] not ... make reasonable accommodation to the known physical or mental limitations of an otherwise qualified applicant or employee with a disability, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of its business." 29 C.F.R. 1630.9(a) (2003); *accord Ballard*, 284 F.3d at 960; *Dropinski v. Douglas County*, 298 F.3d 704, 707 (8th Cir. 2002). . . .  Reasonable accommodation claims are not evaluated under the *McDonnell Douglas* burden-shifting analysis. Rather,"a modified burden-shifting analysis" is applied.  *Fenney,* 327 F.3d at 712. . . .  This is so because a claim against an employer for failing to reasonably accommodate a disabled employee does not turn on the employer's intent or actual motive. . . . In a reasonable accommodation case, the "discrimination" is framed in terms of the failure to fulfill an affirmative duty--the failure to reasonably accommodate the disabled individual's limitations. The Act compels employers to modify their work requirements to enable disabled individuals to have the same opportunities as their non-disabled counterparts. *Kiel v. Select Artificials, Inc.,* 169 F.3d 1131, 1136 (8th Cir.1999); 29 C.F.R. § 1630, app. (2003) ("The reasonable accommodation requirement is best understood as a means by which barriers to the equal employment opportunity of an individual with a disability are removed or alleviated").  The concern is compelling behavior. . .

> [D]iscrimination occurs when the employer fails to abide by a legally imposed duty. The known disability triggers the duty to reasonably accommodate and, if the employer fails to fulfill that duty, we do not care if he was motivated by the disability. *See Mole v. Buckhorn Rubber Prods., Inc.*, 165 F.3d 1212, 1219-20 (8th Cir.1999) (Lay, J., dissenting), cited in *Fenney*, 327 F.3d at 712. . . . Even so, it is true that, as here, the employer could articulate a reason unrelated to a person's disability that animated its failure to accommodate his limitations. . . . A reasonable accommodation that imposes no undue burden on the employer must still be shown.

*Peebles v. Potter*, 354 F.3d 761, 765 -768 (8th Cir. 2004).  Under this modified burden-shifting approach, Hill has the burden of making a prima facie demonstration that the accommodation requested was "reasonable on its face, *i.e.*, ordinarily or in the run of cases." *Id.* at 768 (quoting *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401(2002)).  If he satisfies that burden, then Kellogg must "show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances."  *Id.* (quoting *Barnett,* 535 U.S. at 402).

I view Hill's requested accommodations, presented through Dr. Hopkins on February 11, 2000 – either for a transfer to the first shift or for a waiver of the progressive discipline policy for his occasional tardiness on the second shift – as reasonable on their face.  The burden shifts to Kellogg to show that there were circumstances particular to this case that demonstrating that an accommodation of Hill's request would have worked an undue hardship on the company.  Kellogg contends that it could not accommodate Hill's request for a transfer to first shift because such a transfer would have violated the seniority provisions of the CBA.  The Eighth Circuit Court of Appeals has held that the ADA does not require an employer to accommodate a disabled employee by superseding the seniority rights of other employees under a CBA.  *Benson v. Northwest Airlines, Inc.* 62 F.3d 1108, 1114 (8th Cir. 1995)(holding that the ADA does not require and employer to take action

13

inconsistent with the contractual rights of other workers under a collective bargaining agreement).[4]

However, Hill contends that there is a genuine issue of material fact regarding whether Kellogg could have accommodated his requested transfer to the first shift without infringing on the collectively-bargained rights of the other Kellogg employees. Section 807 of the supplemental contract to the CBA that in place in 2000, provides:

> An employee becoming unable to perform the duties to which they [sic] are assigned, due to the infirmities of age of physical handicap, will be considered for a transfer to any job provided that their *plant* seniority is sufficient and they are qualified.

(Ex. D at 32-33, and see Ex. E).   There is evidence that Silsbee, the plant's human resources manager, believed that Section 807 would have permitted Hill's placement on the first shift despite his lack of seniority.  (Ex. G). Hill also states that his seniority date was May 2, 1989, and that he had more seniority than other persons who, during 2000, were assigned to the day shift – albeit in different departments.  (Ex. J, Filing No. 71, Mabry Dep. at Exs. 72 and 73).  Mabry has stated that departmental seniority controls, rather than plant seniority, as stated in Section 807. (8:02CV436, Filing No. 73, Ex. B. ¶7; 8:04CV60, Filing No. 66, Ex. B. ¶ 7).  I conclude this evidence is sufficient to create a genuine issue of material fact regarding whether Hill's requested transfer to first shift could have been accommodated without violating other employees' seniority rights under the CBA.  I also conclude there is a genuine issue of material fact regarding whether Hill's request to be

---

[4] Other federal circuit courts that have considered the issue agree.  *See Eckles v. Consolidated Rail Corp.*, 94 F.3d 1041, 1051 (7th Cir.1996) ("After examining the text, background, and legislative history of the ADA duty of 'reasonable accommodation,' we conclude that the ADA does not require disabled individuals to be accommodated by sacrificing the collectively bargained, bona fide seniority rights of other employees"), *cert. denied*, 520 U.S. 1146 (1997); *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1125 (10th Cir.1995) (recognizing that plaintiffs' collective bargaining agreement prohibits their transfer to any other job because plaintiffs lack the requisite seniority); and *Foreman v. Babcock & Wilcox Co.,* 117 F.3d 800, 809 (5th Cir.  1997)(holding that seniority provisions of a CBA do not violate the ADA).

relieved of Kellogg's progressive discipline policy for failing to timely notify the company of his tardiness would have worked an undue hardship on Kellogg.  Summary judgment will not be granted to Kellogg on the theory that Hill's disabilities were reasonably accommodated.[5]

Kellogg also contends that Hill suffered no "adverse employment action" as construed under the ADA.  Hill contends that he suffered an adverse employment action in that he was subject to disciplinary procedures for his tardiness, which resulted in his decision to go on disability leave or face termination for excessive tardiness.  The Eighth Circuit Court has recognized that when an employer, through its own actions, creates an environment in which an employee has no other choice than to demote himself, then the court will recognize a constructive demotion, much like a constructive discharge.  *Fenney v. Dakota, Minnesota & Eastern R. Co.*, 327 F.3d 707, 712 (8th Cir. 2003).  I view the facts of this case similarly.  Hill has presented evidence that, having been subjected to Kellogg's progressive discipline for his failure to abide by Kellogg's call-in policy, he believed that if he did not go on short term disability leave, he would have been suspended and ultimately terminated.[6]

**Family and Medical Leave Act Claim**

The FMLA provides eligible employees up to 12 workweeks of unpaid leave during any 12-month period. 29 U.S.C. § 2612.  An employee must provide notice to an employer

---

[5] This is a close question, because there is also undisputed evidence that Kellogg did accommodate many of Hill's requests.  For example, Kellogg acted swiftly in accommodating Hill's request to transfer from the third shift; Kellogg granted Hill several days of leave due to his narcolepsy; and, although Hill received progressive discipline for his tardies on second shift, it is not apparent that future tardies would have resulted in his termination.

[6] I acknowledge that while the Eighth Circuit Court of Appeals has recognized theories of constructive discharge and constructive demotion, constructive transfer to short term disability status has not been specifically recognized.  While there is sufficient evidence to preclude summary judgment on the adverse-action theory, Hill's evidence of adverse action is minimal.

that the employee plans to take FMLA leave. 29 U.S.C. § 2612(e)(2). The FMLA prohibits employers from discriminating against employees for asserting rights under the Act, and this prohibition includes consideration of an employee's use of FMLA leave as a negative factor in any employment action. 29 U.S.C. § 2615(a)(2). See *Darby v. Bratch*, 287 F.3d 673, 679 (8th Cir. 2002).

Kellogg seeks summary judgment on the FMLA claim because the Complaint was filed after the two-year statute of limitations had run. In most cases, the statute of limitations for an FMLA claim is "not later than 2 years after the date of the last event constituting the alleged violation for which the action is brought." 29 U.S.C. § 2617(c)(1). Where a plaintiff can show a willful violation, the limitation period is extended to three years. 29 U.S.C. § 2617(c)(2). At the latest, the statute of limitations would have run on the date that Kellogg last refused to grant Hill FMLA leave for his tardiness -- January 19, 2000. (Ex. R). This lawsuit was not filed until September 19, 2002. I conclude that the events giving rise to the FMLA claim are time barred, unless Hill can demonstrate that Kellogg acted willfully.

The FMLA does not define "willful," and the United States Supreme Court has not defined it in the context of the FMLA. However, in the context of the Fair Labor Standards Act, the Supreme Court has defined "willful" in the following terms: "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited under the statute." *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133 (1988). The Eighth Circuit Court of Appeals has stated that it believes the Supreme Court's definition of "willful" under the FLSA applies to the term "willful" in the FMLA, and noted that the term requires that an employer do more than simply appreciate that the statute is "in the picture." *See Hanger v. Lake County,* 390 F.3d 579, 583 (8th Cir. 2004) (*quoting McLaughlin*, 486

U.S. at 132). I find nothing in the record to support an allegation that Kellogg was reckless in denying Hill's request for FMLA for his tardiness. While Kellogg may have been mistaken, nothing in the record demonstrates willfulness. Because Hill's FMLA claim is barred by the applicable two-year statute of limitations, I need not reach the merits of his FMLA claim. Summary judgment shall be entered at the conclusion of this case in favor of Kellogg on Hill's FMLA claims.

**ERISA Claim**

Kellogg and the Committee seek summary judgment on the basis that they are not the proper defendants to Hill's ERISA claim, but rather, that the Plan itself is the proper defendant. Hill's recently-filed motion to amend the Complaint to add the Plan as a defendant was denied. (Filing No. 58). While Hill concedes that Kellogg is not the proper defendant, Hill maintains that because the Committee is a fiduciary and is the decision-maker that exercises discretion pursuant to the Plan, the Committee is properly named as a defendant on the ERISA claim. I agree. While an "employee benefit plan itself is ordinarily liable for benefits payable under the terms of the plan and is thus the primary defendant," the Eighth Circuit has also held that a sole administrator of a plan may be a proper defendant. *Compare Ross v. Rail Car America Group Disability Income Plan,* 285 F.3d 735, 741 (8th Cir. 2002), with *Layes v. Mead Corp.*, 132 F.3d 1246, 1249 (8th Cir. 1998)(quoting *Garren v. John Hancock Mut. Life Ins. Co.*, 114 F.3d 186, 187 (11th Cir.1997) (holding that "the proper party defendant in an action concerning ERISA benefits is the party that controls administration of the plan.").

The Supreme Court has declared that a de novo standard of review applies to a challenge to a denial of benefits, unless the benefit plan grants the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the

17

plan. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). When a plan gives the administrator discretionary authority to determine eligibility for benefits, then a plan administrator's decision is reviewed for an abuse of discretion. *Id.* Under an abuse of discretion standard, a plan administrator's decision will stand if reasonable, even if the Court disagrees with the interpretation. *Hebert v. SBC Pension Benefit Plan*, 354 F.3d 796, 799 (8th Cir. 2004). A decision is reasonable if it is "supported by substantial evidence." *Fletcher-Merrit v. NorAm Energy Corp.*, 250 F.3d 1174, 1179 (8th Cir. 2001)(*quoting Donaho v. FMC Corp.*, 74 F.3d 894, 899 (8th Cir. 1996)). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (*quoting Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938)). *See also Neumann v. AT & T Communications, Inc.* 376 F.3d 773, 781-82 (8th Cir. 2004).

The Plan confers the Pension Committee with discretionary authority to interpret and apply the terms of the Plain as outlined in the General Powers provision, as follows:

> The Pension Committee shall, in all matters relating to the administration, interpretation, application and enforcement of the Plan, endeavor as far as possible, to act by general and uniform rules and regulations and shall have power to the extent not otherwise provided by the Plan:
>
> a.      To decide any question arising in the administration, interpretation, application and enforcement of the Plan;
>
> b.      To determine, in accordance with the provision herein set forth, the eligibility of a Participant or a Vested Pensioner for a Pension or other payment and, if eligible, his rights hereunder.

(Ex. S. ¶ 7.7, at 58-59). The Plan also states that all majority votes of the Committee

> shall be binding within the authority of the Pension Committee and conclusive upon the Employer, the Participants and all other parties and persons having or claiming to have any interest whatsoever in the Plan.

(*Id.* at ¶7.8, at 59).

18

I find that the Plan unambiguously gives the Committee, as the plan administrator, discretionary authority to determine eligibility for benefits and to interpret and construe the terms of the plan.  According to *Firestone v. Bruch*, therefore, the deferential  "abuse of discretion" standard applies.  The Court is thus limited to reviewing the administrative record.  *Cash v. Wal-Mart Group Health Plan,* 107 F.3d 637, 641 (8th Cir. 1998), citing *Collins v. Central States S.E. & S.W. Areas Health & Welfare Fund*, 18 F.3d 556, 560 (8th Cir. 1994).

I conclude that under the Plan's definition of disability, and given the medical and other information available to the Committee, the Committee's denial of Hill's application was reasonable and supported by substantial evidence.  (*See* Ex. S at ¶2.1(i)).   In particular, I find that there is no convincing evidence that Hill was totally and permanently disabled from engaging in any substantial gainful activity.  (Ex. U).  In support of his appeal from a denial of his initial application, Hill submitted an Attending Physician's Statement of Disability prepared by Dr. Hopkins and dated March 13, 2003.  In the statement, Dr. Hopkins checked the boxes indicating that Hill was totally disabled from working.  However, a notation on the record restates Hill's diagnosis of "severe sleepiness and cataplexy" and states that his condition "inhibits his ability to work overtime or shift work."  Dr. Hopkins volunteers that Hill's condition "could potentially be managed with meds and a regular daytime work schedule."  (Exs. W; and U). In addition, Hill's psychiatrist, Lilly Stoller, M.D., provided her opinion that Hill was totally disabled, but acknowledged that his paranoia might be treatable with medication.  (*Id.* at U).  This information does not establish that Hill was totally and permanently disabled.  Accordingly, I conclude that the Committee did not abuse its discretion, and that the Plan's denial of benefits to Hill must be upheld.

Hill argues that a heightened standard of review should apply to the Committee's decision because of procedural irregularities. "For heightened review to apply, a beneficiary claiming procedural irregularities must show that the plan administrator, in the exercise of its power, acted dishonestly, acted from an improper motive, or failed to use judgment in reaching its decision." *Neumann v. AT & T Communications, Inc.* 376 F.3d 773, 781 (8th Cir. 2004). While it is true that the Committee first considered Hill's appeal from the denial of benefits prematurely and without the benefit of Dr. Hopkins's Statement of Disability, the evidence is uncontroverted that after the Committee received Dr. Hopkins's statement, the new information was reviewed and the denial of disability benefits was affirmed and communicated to Hill in correspondence dated May 29, 2003. (Exs. X and Y).

## CONCLUSION

For the reasons provided in this Memorandum and Order, summary judgment shall be entered in favor of the Defendants on the Plaintiff's claims under the FMLA and ERISA. The Plaintiff's claim under the ADA shall proceed to trial.

IT IS ORDERED:

1. Defendant's Motion for Summary Judgment is granted in part and denied in part as follows:

   a. In Case No. 8:02cv436, the Defendant's Motion for Summary Judgment (Filing No. 56) on the ADA claim is denied and the Defendant's Motion for Summary Judgment on the FMLA claim is granted;

   b. In Case No. 8:04cv60, the Defendants' Motion for Summary Judgment (Filing No. 43) on Plaintiff's ERISA claim is granted;

2.      In Case No. 8:04CV60, all pending objections (Filing No. 38) and motions (Filing No. 55) are denied as moot, and a separate judgment will be entered in favor of Defendants; and

3.      In Case No. 8:02CV436, Plaintiff's claim against Kellogg USA alleging a violation of the ADA shall proceed to trial commencing Tuesday, September 6, 2005.

DATED this 11th day of August,  2005.

                                        BY THE COURT:

                                        s/Laurie Smith Camp
                                        United States District Court Judge